UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                        )
GARY CHAPMAN,                           )
          Plaintiff,                    )
                                        )
     v.                                 )    C.A. No. 09-518 S
                                        )
SUPPLEMENTAL BENEFIT RETIREMENT         )
PLAN OF LIN TELEVISION CORPORATION      )
AND SUBSIDIARY COMPANIES; and LIN       )
TELEVISION CORPORATION, individually    )
and as Administrator and Fiduciary,     )
          Defendants.                   )
_____)

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

     Gary Chapman brought this suit pursuant to the Employment

Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.

("ERISA"), to resolve a dispute over the calculation of

retirement benefits due to him upon his retirement from LIN

Television Corporation ("LIN").  Before the Court are the

parties' cross-motions for summary judgment.  For the reasons

set forth below, the Court denies Chapman's motion for summary

judgment and grants LIN's motion for summary judgment.

     I.   Background

     Effective July 10, 2006, Plaintiff Gary Chapman resigned

from LIN after more than seventeen years of employment, which

culminated with him holding the positions of President,

Chairman, and Chief Executive Officer.

During his time at LIN, Chapman became a vested member of two of LIN's retirement plans, _viz._, the Supplemental Benefit Retirement Plan of LIN Television and Subsidiary Companies ("Supplemental Plan") and the LIN Television Corporation Retirement Plan ("Qualified Plan") (collectively, the "Plans"). The Supplemental Plan, known as a "top-hat" plan in the industry, is only offered to high-ranking executives and provides certain tax benefits.   Chapman's Supplemental Plan benefit is based on and intertwined with his Qualified Plan benefit.

The Qualified Plan provides that Chapman's monthly benefit, upon reaching sixty-five years of age, is to be equal to one-twelfth of 1.5% of his "Average Annual Earnings" multiplied by his years of "Credited Service."  (_See_ Qualified Plan § 5-A.2, Ex. LIN.00621 to Defs.' Cross-Mot. for Summ. J. on Pl.'s Claim for Additional Benefits under the Supplemental Plan (hereinafter "Defs.' Cross Mot."), ECF No. 50.)  "Average Annual Earnings" is defined as the plan participant's highest average annual "Earnings" for _any_ three "Earnings Computation Periods," _viz._, calendar years.  (_Id._ § 1.1(h), Ex. LIN.00604 (emphasis added).)  The calendar years do not need to be consecutive.  "Earnings" are defined in the Qualified Plan as a plan participant's

> wages, salaries, bonuses, commissions, and overtime
> for personal services actually rendered in the course
> of employment with an Employer paid to him for such

> Earnings Computation Period for services as an
> Employee, as further described below . . . . Earnings
> shall include any salary payments or bonuses deferred
> pursuant to a 401(k) plan or other deferred
> compensation arrangement.

(Id. § 1.1(r), Ex. LIN.00605.)   The Qualified Plan expressly

excludes from the definition of "Earnings" the following:

> fringe benefits, including health and welfare
> contributions, stock option gains, moving expense
> reimbursements, qualified transportation fringe
> benefits described in Section 132(f)(4) of the
> [Internal Revenue] Code, any other reimbursements or
> expense allowance payments, and payments of any
> previously deferred compensation.

(Id.)  The Qualified Plan does not define "Wages" or "Salaries."

Under the Plans, LIN, as the plan administrator, has the

"sole discretionary right, authority, and power to interpret and

construe the Plan, and to determine any disputes arising

thereunder. . . ."   (Id. § 14.1, Ex. LIN.00650; see also

Supplemental Plan § 3(e), Ex. LIN.00700 to Defs.' Cross Mot.)

Prior to his departure from LIN, on June 13, 2006, Chapman,

with the assistance of counsel, negotiated and executed an

Employment Transition Agreement ("Transition Agreement") and

General Release ("Release").  The Transition Agreement provided,

inter alia, that Chapman receive a lump-sum payment of

$5,378,739 (the "lump-sum payment") approximately six months

after Chapman's July 10, 2006 effective retirement date.

(Transition Agreement ¶¶ 1, 3(a), Ex. LIN.00573-74 to Defs.'

Cross Mot.)  The Transition Agreement further provides:

3

> [Chapman] understands and agrees that the Severance Payment is good and valuable consideration for the covenants and obligations of [Chapman] hereunder, including the Resignation and General Release contemplated hereby, and that [Chapman] shall only be entitled to receive the Severance Payment and any other consideration contemplated hereby upon execution of this Agreement and the Resignation and General Release contemplated hereby and [Chapman's] election to not revoke such General Release.

(Id. § 3(b).)

The Transition Agreement expressly states that it terminated, effective July 10, 2006, a previously-executed employment and severance agreement; that the Transition Agreement constitutes the "entire agreement and understanding" between LIN and Chapman; and that it "supersedes all prior agreements" between the parties. (Id. § 20.)  Together with the Transition Agreement, Chapman executed the Release, which released LIN from all claims, except those relating to certain specified rights.

In July 2006, Chapman and LIN butted heads over whether LIN was required to withhold Rhode Island state income tax from the lump-sum payment.  LIN took the position that it was required to withhold Rhode Island income tax from the payment because the payment was compensation for past services rendered.  Chapman countered that the payment was made pursuant to the Transition Agreement and was not payment for past services.  During the course of sorting this out, in a letter to Chapman dated

September 21, 2006, Justin Holden, then-counsel for LIN, stated that the payment was "in settlement of rights [Chapman] accrued over his years of service in Rhode Island and that nothing is properly attributable to future services." (Letter from Justin S. Holden, Esq. to David C. Morganelli, Esq. (Sept. 21, 2006), Ex. LIN.00562 to Defs.' Cross Mot.)[1]  LIN adopted this position and remitted the lump-sum payment to Chapman, less a seven-percent withholding of Rhode Island income tax.

In October 2008, Chapman requested benefit calculations for himself and his ex-wife.  In response, LIN conferred with Prudential Retirement ("Prudential"), which acted as a third-party actuary for the Plans.  Prudential produced the requested benefit calculations.  In doing so, it did not include the lump-sum payment as a component of "Earnings" for purposes of calculating Chapman's expected benefits under the Plans.  According to LIN and Prudential, the calculations were made in conformance with its long-standing policies relating to the treatment of severance payments.

_____

[1] Attorney Holden apparently drafted an earlier letter to this effect dated August 25, 2006. (See Letter from Justin S. Holden, Esq. to Denise M. Parent, Esq. (Aug. 25, 2006), Ex. I to Pl.'s Mot. for Summ. J., ECF No. 47-12.)  This letter is not part of the administrative record, and nothing suggests that Chapman submitted the letter to LIN for its consideration during the claims process.  Therefore, as discussed below, the Court does not consider the August 2006 letter in reaching its decision.

Apparently unhappy with this calculation, on January 27, 2009, Chapman filed an administrative claim for benefits with LIN, in which he requested that LIN treat the lump-sum payment as "Earnings." In April 2009, Chapman began receiving benefit payments under the Plans. Together, Chapman and his ex-wife receive gross payments of approximately $55,600 per year under the Qualified Plan and $347,613 per year under the Supplemental Plan. Pursuant to a court order that entered during the course of their divorce proceedings, Chapman and his ex-wife split the benefit equally. LIN's plan administrator, after reviewing Chapman's claim, the Plans, and the Transition Agreement, denied Chapman's claim, taking the position that the lump-sum payment did not fall within Chapman's "Earnings," as it is defined in the Qualified Plan.

Chapman thereafter requested additional information related to the plan administrator's decision. Among other things, he asked for documentation evincing how LIN had treated other former employees under the Plans. In response, the plan administrator provided Chapman with 166 pages of responsive documents. LIN produced, in these materials, a list of payroll codes reflecting income items excluded from an employee's pension calculation; the list included "severance" as an excluded item.

Chapman unsuccessfully appealed the denial of his administrative claim and thereafter filed suit in this Court seeking judicial review. The parties have filed cross-motions for summary judgment, asking the Court to review LIN's determination that the lump-sum payment does not constitute "Earnings" as it is defined in the Qualified Plan. For the reasons set forth below, the Court denies Chapman's motion and grants LIN's motion.

II.  Legal Standard

"When an ERISA plan gives an administrator discretionary authority to determine eligibility for benefits or construe the plan's terms, the district court must uphold the administrator's decision unless it is 'arbitrary, capricious, or an abuse of discretion.'"  D & H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011) (quoting Cusson v. Liberty Life Assur. Co. of Boston, 592 F.3d 215, 224 (1st Cir. 2010)).  "[T]he arbitrary and capricious standard is functionally equivalent to the abuse of discretion standard." Id. at 34 n.5 (quoting Wright v. R.R. Donnelley & Sons Grp. Benefits Plan, 402 F.3d 67, 74 n.3 (1st Cir. 2005)). "In such cases, 'summary judgment is simply a vehicle for deciding the issue' and 'the non-moving party is not entitled to the usual inferences in its favor.'"  Id. at 34 (quoting Cusson, 592 F.3d at 224).

III. Discussion

Before reaching the merits of the plan administrator's decision, there are three threshold issues.  First, whether Chapman should be granted leave to conduct additional discovery; second, whether the Court should consider extra-record evidence in reviewing the plan administrator's decision; and third, whether the plan administrator's dual role (i.e., it pays out benefits and makes benefit eligibility determinations) influenced its decision to deny Chapman's benefits claim.

A.   Additional Discovery

Chapman moves to conduct additional discovery in order to uncover additional evidence of how the plan administrator has treated other employees in similar situations.[2]  Chapman argues that, in denying his previous request for this information, LIN

---

[2] After he received LIN's adverse decision, dated April 24, 2009, Chapman requested certain information from LIN, including

> [a] list of all individuals paid a severance payment upon termination from January 5, 1986 through and including June 13, 2006 . . . ; include the reason for the termination, whether the payment was in accordance with the Company's severance policy; how the payment was calculated; whether the payment was included as wages on the W-2 of the employee and an explanation of any difference between the wage amount on the W-2 and the 'earnings' credited to the employee under the Plans. . . .

(Letter from Gerald E. Kubasiak to Dan Donohue (May 4, 2009), Ex. LIN.00312 to Defs.' Cross Mot.)

violated 29 C.F.R. § 2560.503-1,[3] which provides for the discovery of relevant information used in a plan's adverse benefit determination.

LIN retorts that it was not required to provide other claimants' materials to Chapman, but that it did provide Chapman with its correspondence with Prudential and a list of payroll codes reflecting its standard treatment of severance payments.

The Court denies Chapman's request to conduct additional discovery for several reasons.  First, Chapman has waived his request for further discovery.  Chapman's discovery request, which was answered by LIN, was filed thirty days late;[4] Chapman

---

[3] 29 C.F.R. § 2560.503-1(j) states in pertinent part:

In the case of an adverse benefit determination, the notification shall set forth, in a manner calculated to be understood by the claimant[:]

. . . .

A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.

The regulation further defines "relevant" information, records, or documents to include those that were "relied upon in making the benefit determination" or "submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon . . . ."  Id. at § 2560.503-1(m)(8).

[4] The Court entered a text order on August 3, 2011 allowing the parties sixty additional days to complete discovery.  Review of the Court's notes from the chambers conference held that day

thereafter failed to file a motion to compel; Chapman did not confer with Defendants regarding the purported discovery failures in accordance with the local rules of this Court; and Chapman has not filed an affidavit or declaration pursuant to Fed. R. Civ. P. 56(b) demonstrating why he is unable to present facts essential to his opposition to LIN's motion.

Second, Chapman's allegation that LIN violated 29 C.F.R. § 2560.503-1 has no merit. Nothing in the record, or elsewhere for that matter, suggests that LIN relied upon the requested materials in reaching its determination, or that the materials were "submitted, considered, or generated in the course of making the benefit determination." 29 C.F.R. § 2560.503-1(m)(8)(ii).

Third, it is unlikely that additional discovery would prove fruitful. Chapman was employed by LIN for over seventeen years, and he departed after reaching the rank of Chairman, President, and Chief Executive Officer. It is, therefore, unlikely that there exist other employees who were similarly situated, in status or in the financial terms upon which they departed. Under such circumstances, the First Circuit has noted that

---

reflects that the Court gave the parties sixty days to complete discovery, but the Court did not pass on the merits of Chapman's discovery request. Chapman filed his discovery request on October 1, 2011, the date by which the Court had ordered discovery to be <u>completed</u>.

additional discovery to unearth information about the treatment of other employees is not likely to be productive:

> [C]omparison of the files of others who received or were denied benefits invites an open-ended and probably hopeless attempt to compare disparate situations -- whether impressionistically or by drawing up formulas purporting to explain the outcomes. The search through other records would have to be exhaustive; it would be only the predicate to further dispute about the significance of the information; and probably it would not be conclusive. Every administrative denial would be an occasion for a vast and expensive inquiry into what judges sometimes call "collateral issues."

Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 26 (1st Cir. 2003) (internal citation and footnote omitted). Accordingly, even assuming that Chapman has not waived this argument, the Court denies Chapman's request to conduct additional discovery for all the reasons set forth above.

B.   Extra-Record Evidence

Closely related to Chapman's discovery request is the issue of extra-record evidence. Both parties are guilty of relying upon extra-record evidence, but, at the hearing on this motion, at least one of the parties (and arguably both) agreed that the Court should rely exclusively on the administrative record, thereby abandoning its proffered extra-record evidence. In any event, even without this concession, the Court would decline to consider extra-record evidence.

11

While a court's review of an administrative decision is generally restricted to the administrative record, "certain kinds of claims -- *e.g.*, proof of corruption -- may in their nature or timing take a reviewing court to materials outside the administrative record." *Id.* at 23. But "at least some very good reason is needed to overcome the strong presumption that the record on review is limited to the record before the administrator." *Id.*; *see also* Ayer v. Liberty Life Assur. Co. of Boston, 382 F. Supp. 2d 162, 181 (D. Me. 2005) (holding that, because there was no claim that claimant was not allowed to present evidence to administrator, there was no need to consider extra-evidence evidence). The First Circuit has noted that such a "very good reason," Liston, 330 F.3d at 23, exists "[w]here the challenge is not to the merits of the decision to deny benefits, but to the procedure used to reach the decision . . . ." Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 520 (1st Cir. 2005).

Here, the extra-record evidence that Chapman offers (such as employment and severance agreements between himself and LIN and a second letter written by LIN's attorney, Justin Holden) does not go to the process employed by the plan administrator in reaching its benefit determination; rather, Chapman points to documents that support his interpretation of the word "Earnings." Similarly, the Court will not consider Chapman's

so-called "admissions" (relied upon by LIN), which were made during the arbitration proceedings related to the Rhode Island income tax withholding dispute.

In sum, the parties have failed to assert "at least some very good reason" to defeat "the strong presumption that the record on review is limited to the record before the administrator," Liston, 330 F.3d at 23, and accordingly, the Court confines its review to the administrative record.

C.   The Plan Administrator's Conflict of Interest

When an insurance company or an employer "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," this dual role "creates a conflict of interest." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008). The Court "should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits" and "the significance of the factor will depend upon the circumstances of the particular case." Id. It is clear after Glenn that, when it is undisputed that the plan administrator functions in a so-called dual role, there is an inherent conflict of interest. Id.; see also Cusson, 592 F.3d at 225.[5]

---

[5] In addition to LIN's dual role, Chapman further notes that the top-hat plan at issue is not funded by LIN, but rather, LIN must pay benefit claims out of pocket as they arise. Regardless of this point, there is an inherent conflict of interest here,

Chapman, however, has the burden of proving that the conflict of interest _influenced_ LIN's decision-making process. See Cusson, 592 F.3d at 225 (holding that claimant bears burden of establishing that conflict influenced the plan administrator's decision to deny benefits). As the administrative record stands, Chapman can point to no evidence that the conflict of interest influenced LIN's decision; his only "proof" is that his claim was denied. LIN, on the other hand, has advanced evidence of its efforts to insulate its decision-making process from the influence of its structural conflict, including its employment of a third-party actuary, Prudential, that has no financial stake in the determinations. The Court has scoured the record looking for signs of bias to no avail, and therefore, it will proceed to decide whether the plan administrator's denial of Chapman's claim was arbitrary and capricious, affording little weight to the conflict inherent in the plan administrator's dual-role. See id. at 228.

---

given the administrator's dual role. But see Comrie v. IPSCO, Inc., 636 F.3d 839, 841-42 (7th Cir. 2011) (noting that it may be less likely for dual-role administrator to be influenced in deciding benefits of top executives because those decisions are likely binding on other members of plan's administrative committee).

D.   Whether the Plan Administrator's Decision was Arbitrary and Capricious or an Abuse of Discretion

The Transition Agreement provides for Chapman to receive the lump-sum payment, which the Transition Agreement refers to as the "Severance Payment." (Transition Agreement § 3(a), Ex. LIN.00574.)   It further states that the lump-sum payment was "good and valuable consideration for [Chapman's] covenants and obligations" under the Transition Agreement and that he was only entitled to receive the lump-sum payment and "any other consideration contemplated hereby upon execution of this Agreement and the Resignation and General Release contemplated hereby and [Chapman's] election to not revoke such General Release." (Id. § 3(b).)  For his part, Chapman agreed to resign effective July 10, 2006, sign the General Release, refrain from soliciting LIN employees for one year following his departure, be available to consult with LIN for three months following his departure, and keep confidential certain information.  (See id. §§ 1, 3(b), 6(a), 7, and 9, Ex. LIN.00573-76.)

The plan administrator, in its decision, concluded that the lump-sum payment should not be included in "Earnings" for purposes of calculating Chapman's pension benefits because: (1) the lump-sum payment did not constitute "Wages" or "Salaries," but rather, it was in consideration of the Release and was "meant to ease Mr. Chapman's transition and to provide a bridge

to his next employment opportunity"; (2) it was not a payment for "personal services" rendered during the course of employment; and (3) LIN "has consistently interpreted the Plans to exclude severance payments . . . ." (Letter from Daniel V. Donohue to Gerald E. Kubasiak, Esq. (Apr. 24, 2009), Ex. LIN.00309-10 to Defs.' Cross Mot.; see also Letter from Dan Donohue to Gerald E. Kubasiak, Esq. (Aug. 14, 2009), Ex. LIN.00569-70 to Defs.' Cross Mot.)   Chapman attacks this decision as arbitrary and capricious.

Chapman advances a number of arguments in challenging LIN's characterization of the lump-sum payment.   Relying on the plain language of the Qualified Plan, he contends that the payment constitutes "Wages" and/or "Salaries" and that it was not expressly excluded from the definition of "Earnings."   Chapman further argues that LIN's decision is not supported by substantial evidence because there is no evidence in the record that he was treated similarly to like employees.   Moreover, Chapman contends that LIN's tax treatment of the lump-sum payment, in conjunction with Holden's letter, supports his position.

The Qualified Plan defines earnings as a plan participants'

    wages, salaries, bonuses, commissions, and overtime
    for personal services actually rendered in the course
    of employment with an Employer paid to him for such
    Earnings Computation Period for services as an
    Employee, as further described below . . . . Earnings

16

> shall include any salary payments or bonuses deferred pursuant to a 401(k) plan or other deferred compensation arrangement.

(Qualified Plan § 1.1(r), Ex. LIN.00605.)   Expressly <u>excluded</u> from "Earnings" are:

> fringe benefits, including health and welfare contributions, stock option gains, moving expense reimbursements, qualified transportation fringe benefits described in Section 132(f)(4) of the [Internal Revenue] Code, and any other reimbursements or expense allowance payments, and payments of any previously deferred compensation.

(<u>Id.</u>)

Because the Qualified Plan does not define "Wages" and "Salaries," the Court looks to the ordinary meanings of the terms.   <u>Webster's Dictionary</u> defines "wage" as "a pledge or payment of usu[ally] monetary remuneration by an employer esp[ecially] for labor or services usu[ally] according to contract and on an hourly, daily, or piecework basis . . . ." <u>Webster's Third New International Dictionary</u> 2568 (11 ed. 2002). Given this definition, it was not arbitrary and capricious for LIN to conclude that the lump-sum payment did not constitute "Wages"; the payment was plainly not intended to compensate Chapman for labor or services performed on "an hourly, daily, or piecework basis."   Instead, it was entirely within reason for LIN to conclude that the lump-sum payment was tendered in consideration for Chapman's resignation, release of claims

against the company, promised confidentially, and consulting, rather than for "personal services tendered during employment."

Nor was it an abuse of discretion for LIN to conclude that the lump-sum payment should not be considered "Salary." "Salary" is commonly defined as a "fixed compensation paid regularly (as by the year, quarter, month, or week) for services . . . esp[ecially] such compensation paid to holders of official, executive, or clerical positions – often distinguished from wage." Webster's Third New International Dictionary 2003 (11 ed. 2002). By definition, the lump-sum payment was not paid "regularly," and thus, it is clear that LIN did not behave arbitrarily or capriciously in deciding that the payment was not a "salary," within the plain meaning of the word. The practical reality, in this writer's view, is that payments of this sort are a hybrid of compensation for past services (considering both length of service and performance) and consideration for the release of claims. The dominant factor is the consideration for the release; the former factor simply defines the payment that will be needed to secure the release. LIN's decision is clearly in line with this reality.

While the Qualified Plan expressly excludes certain items from "Earnings," it was also not an abuse of discretion for the plan administrator to conclude that the list is not exhaustive, but rather that it serves to resolve questions surrounding items

18

about which there is frequent inquiry. LIN supplied Chapman with a list of twenty-nine payroll codes reflecting income items excluded from an employee's pension calculation, including "severance."[6] While not among the items expressly excluded from "Earnings," LIN also excludes restricted stock, gains under the employee stock purchase plan, and various perquisites.

Chapman unsuccessfully tries to invoke the maxim of expressio unius est exclusion alterius (i.e., the expression of one item of an associated group excludes another left unmentioned); but it has no place in this Court's deferential review of the plan administrator's decision. When the Court reviews the decision of a plan administrator for an abuse of discretion, it "does not involve a construction of the terms of the plan; it involves a more abstract inquiry -- the construction of someone else's construction." Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 93-94 (1st Cir. 2008) (quoting Morton v. Smith, 91 F.3d 867, 871 n.1 (7th Cir. 1996)).

LIN's decision is further supported by the caselaw. Courts have generally held that similar lump-sum payments are not

_____

[6] Chapman maintains that the lump-sum payment was not "severance," while at the same time making much of the fact that "severance" is not enumerated among the items expressly excluded from "Earnings." Regardless of whether the payment is termed "severance," it was clearly exchanged for certain promises by Chapman made in the Transition Agreement, including his promise to keep information confidential and release all claims against LIN.

compensation for purposes of calculating retirement benefits. See, e.g., Krawczyk v. Harnischfeger Corp., 41 F.3d 276, 280 (7th Cir. 1994) (holding that lump-sum severance payment should not be considered compensation for purposes of calculating pension payment under the plan); Licciardi v. Kropp Forge Div. Emps.' Ret. Plan, 990 F.2d 979, 982-84 (7th Cir. 1993) (holding that lump-sum payment for the release of claims related to past-due compensation should not be considered "compensation" for purposes of determining benefits, even if it was considered "compensation" for tax purposes); Lowe v. SRA/IBM-MacMillan Pension Plan, No. 01 C 58, 2002 WL 31804287, at *6 (N.D. Ill. Dec. 12, 2002) (holding that a one-time severance payment was not "compensation" under the retirement plan).

Chapman argues that, regardless of the plain meaning of the contract terms, if LIN consistently includes similar lump-sum payments in a plan participant's calculation for "Earnings," it would be an abuse of discretion not to do so for him.  To this point, Chapman argues that there is no evidence to support the plan administrator's statement that "LIN has consistently interpreted the Plans to exclude severance [and] has always excluded severance from employees' pension calculations." (Letter from Dan Donohue to Gerald E. Kubasiak, Esq. (Aug 14, 2009), Ex. LIN.00570-71.)

But LIN's position finds support in the record.  Prudential performed Chapman's benefit calculation, and in so doing, relied upon LIN's historical treatment of similar payments, as determined by reference to payroll codes.[7]  Prudential's employees have no financial stake in the outcome of the claim decision.  And while Chapman argues that LIN provides no evidence of how similarly situated employees have been treated, it is highly unlikely that there were in fact employees similarly situated to Chapman, in either their status or the financial terms accompanying their departure.

Chapman also strenuously argues that, because LIN took the position in 2006 that the lump-sum payment was made in exchange for personal services rendered, it should not be allowed to flip flop now.  In support of this argument, Chapman points to a letter written by LIN's attorney, Justin Holden, in 2006.

Chapman's argument falls flat.  The Holden letter was properly considered by LIN.  LIN stated in its August 14, 2009 letter (reviewing the initial denial letter): "You point to a letter from Justin Holden, then counsel for LIN, arguing that the Severance Payment was paid to Mr. Chapman as payment for services rendered in Rhode Island.  The correspondence you

---

[7] LIN also relied upon an email from Karen Bednarz, Vice President of Prudential, stating that Prudential consistently interprets the Plans to exclude severance payments in its calculation of earnings.

21

reference was related to whether or not the Severance Payment was subject to taxation in Rhode Island and has no relevance to the Plans." (Id. at LIN.00571.) This was a reasonable interpretation of the letter's significance; the Holden letter was only one piece of evidence considered by LIN, and LIN did not abuse its discretion in not maintaining the position expressed therein. Tax treatment of a severance payment decidedly is not binding on the employer. See Licciardi, 990 F.2d at 984 ("We add that Licciardi properly does not argue that a characterization adopted for tax purposes estops the defendants to contest his claim for pension benefits. . . . More important, contract cases should not be complicated by collateral inquiries into the validity of tax-motivated transactions."); see also Gilliam v. Nevada Power Co., 488 F.3d 1189, 1196–97 & n.8 (9th Cir. 2007) ("Accordingly, we conclude that the district court did not err in holding that a plain reading of the [retirement plan's] definition of Earnings . . . cannot reasonably be interpreted to include severance pay given to an employee to no longer work, notwithstanding the fact that severance pay may be subject to federal income tax." (internal quotation marks omitted)).

Chapman relies heavily on Abrahamsen v. United States, 228 F.3d 1360 (Fed. Cir. 2000), to no avail. In Abrahamsen, the Federal Circuit held that a severance payment tendered in

exchange for employees' resignation and release of all claims constituted "wages" for purposes of assessing taxes under the Federal Insurance Contribution Act, 26 U.S.C. § 3121(a) (commonly referred to as "FICA tax"). But Abrahamsen is a tax case addressing the definition of wages set forth in the IRC, not an ERISA case discussing a plan administrator's interpretation of "Earnings" under a retirement plan. In the instant case, it is undisputed that the lump-sum payment constituted "wages" for purposes of I.R.C. § 3121, but again, this is not binding on LIN's interpretation of the Plans' language.

Finally, Chapman argues that, because the lump-sum payment was calculated in accordance with his previously executed amended severance agreement, it was made in exchange for past services rendered. Not only is the amended severance agreement not in the administrative record and expressly terminated by the Transition Agreement, but this argument does not render LIN's interpretation unreasonable.

In sum, the Court upholds LIN's decision because it "was reasoned and supported by substantial evidence," meaning that the evidence "is reasonably sufficient to support a conclusion and contrary evidence does not make the decision unreasonable." Morales-Alejandro v. Med. Card Sys., Inc., 486 F.3d 693,

23

698 (1st Cir. 2007) (quoting *Denmark v. Liberty Life Assur. Co. of Boston*, 481 F.3d 16, 33 (1st Cir. 2007)).

IV.   Conclusion

For the reasons set forth above, LIN's motion for summary judgment is GRANTED and Chapman's motion for summary judgment is DENIED.

IT IS SO ORDERED.

*/s/ William E. Smith*
William E. Smith
United States District Judge
Date:  May 23, 2012